Steven Jay Katzman (SBN 132755)
skatzman@bienertkatzman.com
Anthony R. Bisconti (SBN 269230)
tbisconti@bienertkatzman.com
**BIENERT | KATZMAN PC**
601 W. 5th Street, Ste. 720
Los Angeles, CA 90071
Telephone (213) 528-3400
Facsimile (949) 369-3701

Jason A. Levine (*Pro hac vice forthcoming*)
jlevine@hangley.com
Andrew E. Erdlen (*Pro hac vice forthcoming*)
aerdlen@hangley.com
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone (215) 568-6200
Facsimile (215) 568-0300

Attorneys for Plaintiff David Rovinsky LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ROVINSKY LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>PETER MARCO, LLC, a California limited liability company, and PETER VOUTSAS, an individual,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR:**<br>**(I)    NEGLIGENCE;**<br>**(II)   CONVERSION;**<br>**(III)  FRAUD;**<br>**(IV)  NEGLIGENT MISREPRESENTATION;**<br>**(V)   CIVIL THEFT (CAL. PENAL CODE § 496); AND**<br>**(VI)  AIDING AND ABETTING CONVERSION AND CIVIL THEFT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Rovinsky LLC ("DR LLC") files this Complaint against Defendants Peter Marco, LLC and Peter Voutsas and alleges as follows:

## NATURE OF THE CASE

1. As set forth more fully below, DR LLC consigned two pieces of jewelry, a ring and a necklace, to Peter Marco, LLC for a total consignment price of $3.4 million. Instead of selling the jewelry, Peter Marco, LLC and its principal, Peter Voutsas ("Voutsas" and, together with Peter Marco, LLC, "Peter Marco"), gave the jewelry to a known felon, Jona Rechnitz ("Rechnitz"), with whom Voutsas had a close relationship, who put the jewelry to his own personal use. Voutsas then lied to David Rovinsky, the principal of DR LLC (collectively, "Rovinsky"), for several weeks to conceal the true nature of Voutsas' relationship and dealings with Rechnitz, inhibiting Rovinsky's ability to recover the jewelry and requiring Rovinsky's company to expend additional money in an effort to obtain the jewelry.

2. As a direct result of Peter Marco's egregious misconduct, Rovinsky's company has incurred more than a million dollars in monetary damages.

## PARTIES

3. Plaintiff DR LLC is an entity formed under the laws of Delaware and has its principal place of business in New York, New York. Mr. David Rovinsky is the sole member of DR LLC, and is a citizen of Pennsylvania.

4. Defendant Peter Voutsas is an individual who resides in Santa Monica, California, and is a citizen of California.

5. Defendant Peter Marco, LLC is an entity formed under the laws of California and has its principal place of business in Beverly Hills, California. On information and belief, Voutsas is the sole member of Peter Marco, LLC.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this district and a substantial part of the events giving rise to this action occurred here.

## FACTUAL ALLEGATIONS

### A. The Consignment Agreements

8. Rovinsky and Peter Marco are both in the jewelry business. Rovinsky is a jewelry dealer that specializes in dealing high-end diamonds and other rare stones. Peter Marco is a retailer with a storefront on Rodeo Drive in Beverly Hills, California.

9. A few years ago, Rovinsky and Voutsas were introduced by a mutual acquaintance in the jewelry industry. In mid-2019, Rovinsky and Voutsas discussed the possibility of Rovinsky's company consigning jewelry to Voutsas and his company, Peter Marco.

10. On November 15, 2019, DR LLC consigned a 43-carat yellow diamond ring (the "Ring") to Peter Marco, with a consignment price of $1.9 million. Attached as Exhibit A is a true and correct copy of the signed consignment agreement evidencing Peter Marco's acceptance of the Ring and consignment price.

11. On November 18, 2019, DR LLC consigned a 134-carat yellow radiant diamond necklace (the "Necklace") to Peter Marco, with a consignment price of $1.5 million. Attached as Exhibit B is a true and correct copy of the signed consignment agreement evidencing Peter Marco's acceptance of the Necklace and consignment price.

### B. Peter Marco Falsely Claimed It Sold Jewelry to an Unidentified "Private Client"

12. In early December 2019, Voutsas represented to Rovinsky that he found a "private client" buyer for both the Ring and the Necklace. DR LLC agreed to accept $2,925,000 for both the Ring and the Necklace, less than the $3.4 million total consignment price, conditioned on both pieces being sold together. Peter Marco could then sell the two pieces for more than $2,925,000 and keep the difference between what it received from the sale and the amount owed to DR LLC.

13. Voutsas represented to Rovinsky that the "private client" (a) did not want to pay for the jewelry until 2020, and (b) provided Peter Marco with a post-dated check, dated January 6, 2020, for the entire sale price of both the Ring and the Necklace.  Voutsas, in turn, told Rovinsky that he would send a check for the consignment price on which they had agreed.

14. On December 16, 2019, DR LLC received a check for $2,950,000, post-dated for January 8, 2020, a true and correct copy of which is attached hereto as <u>Exhibit C</u>. Rovinsky informed Voutsas via text message that he had received the check; that it was $25,000 more than the agreed-upon price; and that his company would send back the difference after the check was deposited.

15. During the next several weeks, Voutsas continued to represent to Rovinsky – on the phone, by text message, and in person – that he had consummated the sale with the "private client"; that he had deposited the "private client's" check for the full sales price; that everything was fine; and that DR LLC could deposit the post-dated check from Peter Marco soon after January 8, 2020.  As Rovinsky later learned, these representations were false.

16. As just one example of Voutsas' misrepresentations, he and Rovinsky had dinner at a restaurant in Los Angeles on January 8, 2020, and Voutsas stated that the check from the "private client" would clear in 5-10 days, and then Rovinsky could deposit the check he received from Peter Marco.  Voutsas assured Rovinsky that this was typical for his bank with deposits of this size.

17. On January 14, 2020, Rovinsky asked Voutsas: "Any news from your bank," and Voutsas responded "Any day now."  Voutsas repeatedly told Rovinsky to rest assured, not to worry, and that they needed just a few more days for the "private client's" check to clear.

18. Rovinsky reasonably relied on Voutsas' representations and assurances.

### C. Rovinsky Learned in Mid-January 2020 That Peter Marco's Representations and Assurances Were False

19. On January 21, 2020, in response to further inquiries from Rovinsky, Voutsas changed his story. Whereas he had previously represented that he had received payment from the "private client," he now represented that he had "most of" the payment.

20. When Rovinsky pressed for more answers, Voutsas wrote the following via text message:

> Don't be nervous
>
> I have spoken with the client I'm pretty sure that the sale will go through
>
> Thursday I will have the goods or I can release the payment

21. To lull Rovinsky into a false sense of security and convince him to continue to believe that the delay in payment was merely an issue with the bank, and that Rovinsky, who was under pressure from business associates who had a financial interest in the consigned jewelry, should stop inquiring about this nearly $3 million transaction, Voutsas misrepresented to Rovinsky that he just learned of an issue with the "private client" and further stated:

> And remember it is 10 business days plus we had a holiday
>
> I really think your partners are not being Realistic as to what happens in life
>
> I told you everything I'm doing everything I can [sic]
>
> I'm sorry if it's not good enough for them
>
> I'm done I will let you know when I know something
>
> I have never in my 40 years have I had to deal with something like this [i.e., pressure from a consignor for payment]
>
> It's a little delayed that's all

>All of this [i.e., Rovinsky's questions] is not making it better or easier

22. Only after Rovinsky traveled to Los Angeles on January 23 to further inquire about the Ring and the Necklace did he learn that all of Voutsas' representations during the prior weeks were false, and that the check Voutsas had sent Rovinsky was a bad check, because it could not be deposited due to insufficient funds in the account from which the check was written.

23. Voutsas did not sell the Ring or the Necklace to a "private client" as he previously claimed. Rather, Voutsas now represented that he gave both pieces to Jona Rechnitz, one of Voutsas' long-time business associates and friends, and a known felon.

24. Rechnitz pled guilty to federal corruption charges in 2016. This was a well-known fact, as both the charges against Rechnitz and his guilty plea were unsealed by a federal court in New York in March 2017, and during the past three years there have been several public reports of Rechnitz testifying in other criminal trials as a witness.

25. On December 19, 2019, Rechnitz was sentenced by a federal court in New York to five months imprisonment and five months home confinement, and he was ordered to pay $10 million in restitution for defrauding the corrections officers of New York City.

26. Voutsas was well aware of Rechnitz's criminal history and fraudulent conduct, as well as his criminal sentencing in December 2019 (and all of that information was publicly disclosed), and Voutsas inexplicably did not tell Rovinsky that he gave the Ring and the Necklace to Rechnitz, or even mention Rechnitz's name, until January 23, 2020.

**D.  Threats Against Rovinsky and Rovinsky's Efforts to Mitigate Loss**

27. On January 23, 2020, Rovinsky learned from Voutsas that Rechnitz converted the Ring and Necklace given to him by Voutsas and used the jewelry as collateral to obtain a $1 million cash loan with an interest rate of 6.5% per month.

28. After Rovinsky learned what had happened, he immediately attempted to mitigate his company's losses by getting the jewelry back. Voutsas hindered that effort.

29. *First*, Voutsas told Rovinsky that the person from whom Rechnitz borrowed money had ties to a Mexican drug cartel and was dangerous in an apparent attempt to deter Rovinsky from pursuing (a) recovery of the jewelry or (b) his company's damages resulting from Voutsas' conduct.

30. *Second,* both Voutsas and another Los Angeles-based jewelry dealer instructed Rovinsky not to report anything to law enforcement and to be patient if he wanted to get his company's jewelry back.

31. Rovinsky reasonably understood these two statements to be threats to his personal safety and his ability to obtain the jewelry.

32. On January 24, Voutsas connected Rovinsky by telephone to the individuals who purportedly loaned money to Rechnitz and claimed to possess the Ring and the Necklace. Voutsas seemed to know these individuals well – he communicated with them by phone and text message, and the nature of their communications clearly evidenced familiarity and a prior relationship.

33. On January 27, Voutsas sent Rovinsky pictures of the Ring and the Necklace in clear plastic bags with "1/27/20" written on them.

34. Also on January 27, and for the next several days after, Voutsas assured Rovinsky that the family of Rechnitz would compensate Rovinsky for all damages incurred. Voutsas also repeatedly acknowledged that he was ultimately responsible for any and all of Rovinsky's losses.

35. On January 29, Voutsas asked to meet with Rovinsky in person about the whereabouts of the jewelry. When Rovinsky and a business associate arrived at the meeting, Voutsas instructed them to surrender their cell phones, and then Voutsas patted down both of them to ensure they had no recording devices.

36. After Voutsas finished the pat-downs, he stated that the persons who purportedly had the jewelry wanted to be paid in cash in two different transactions.

37. Rovinsky, fearing for his own safety and concerned about the appropriateness of Voutsas' proposal, refused to accept it.

38. The parties ultimately agreed that the persons who purportedly had possession of the jewelry would provide one of the pieces – the Ring – in exchange for a $565,000 ransom payment, and that Malca-Amit, a reputable company that provides security and logistical services in the jewelry industry, would broker the transaction and serve as an escrow agent. Specifically, the parties agreed that Malca-Amit would take custody of the Ring, and Malca-Amit would release the Ring only upon receipt of the $565,000 payment.

39. Throughout this trying process, Voutsas continued to communicate directly with the individuals who purportedly had the jewelry. Voutsas relayed these communications to Rovinsky and facilitated Rovinsky making the ransom payment. However, when Rovinsky asked Voutsas to make the payment himself or provide jewelry of equal value, Voutsas acknowledged responsibility for Rovinsky's financial loss but refused to make the payment.

40. Accordingly, on January 31, Rovinsky caused to be paid to Malca-Amit $565,000 in order to mitigate loss, because the Ring was consigned at a price of $1.9 million and the ransom payment was substantially less than that amount. One of Rovinsky's business associates loaned DR LLC the ransom payment, and now DR LLC is obligated to return that money to Rovinsky's associate.

41. During the week of February 3, 2020, the Ring was returned to Rovinsky's business associate.

42. Approximately one month later, Rovinsky caused to be paid to Malca-Amit another $565,000 for the Necklace in order to mitigate loss, and the Necklace was subsequently returned to Rovinsky's business associate. Voutsas initially demanded more than one-hundred thousand dollars on top of this amount in an illegal effort to further extort Rovinsky and his business associate, but after recognizing the significant risk that the Necklace could be seized by law enforcement because it was stolen from Rovinsky, Voutsas and the individuals who had the jewelry accepted $565,000, and DR LLC is now also obligated to return that money to Rovinsky's associate.

### E. Peter Marco Breached the Consignment Agreements with DR LLC and Failed to Exercise Ordinary Care Over the Jewelry

43. DR LLC consigned the Ring and the Necklace to Peter Marco. These consignments constitute valid contracts of bailment between DR LLC and Peter Marco.

44. As a consignee, Peter Marco had a duty to exercise ordinary care with respect to the bailed property, *i.e.*, the Necklace and the Ring.

45. Peter Marco breached this duty by giving the Necklace and the Ring to Rechnitz, a known felon, and then by hindering Rovinsky's efforts to get the jewelry back.

46. On information and belief, Peter Marco knew of Rechnitz's personal circumstances, including his upcoming criminal sentencing hearing on December 19, 2019, and the fact that he was heavily in debt, and Peter Marco sought to help Rechnitz by giving him DR LLC's jewelry to sell or use.

47. As a direct and proximate result of Peter Marco's breach of this duty, DR LLC has incurred damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

### F. Peter Marco and Voutsas Deceived Rovinsky and Made Dozens of Misrepresentations for More Than a Month, Further Harming DR LLC

48. For more than a month, Voutsas lied to Rovinsky about the consigned jewelry. In early December 2019, Voutsas represented that he had a "private client"; that was false. Voutsas then represented that he had received money from the "private client"; that was also false. Voutsas sent Rovinsky a post-dated check, and then repeatedly stated that he was waiting for funds to clear in his bank account, all in a deceptive effort to keep Rovinsky at bay.

49. Voutsas' culpability is without question. He facilitated Rechnitz's fraud, of which he was aware, as evidenced by, among other conduct and statements, the following:

    a. Voutsas attempted to deter Rovinsky from pursuing recovery of the jewelry by claiming a Mexican drug cartel was involved in the illicit transaction Voutsas had facilitated;

   b. Voutsas instructed Rovinsky not to report anything to law enforcement and threatened that Rovinsky was unlikely to get his company's jewelry back if he did;

   c. Voutsas connected Rovinsky with the individuals who claimed to have possession of the jewelry and demanded more than $1 million to get the jewelry back;

   d. Voutsas communicated directly and regularly with those individuals;

   e. Voutsas sent Rovinsky pictures of the jewelry in clear plastic bags at the same time he was (i) encouraging Rovinsky to make the ransom payment and (ii) facilitating the transaction;

   f. Voutsas sought to ensure that he was not being recorded before proposing to Rovinsky that his company make the ransom payment in cash in two separate transactions; and

   g. After rebuffing Rovinsky's efforts to pay to get his Necklace back in an effort to mitigate his company's losses, Voutsas demanded hundreds of thousands of dollars from Rovinsky and his business associate for the Necklace, substantially more than what the individuals who purportedly possessed the Necklace were demanding, in an effort to further extort money from Rovinsky.

  50. Voutsas' conduct was egregious, malicious and willful, and it was intended to harm Rovinsky and his company.

  51. Rovinsky has attempted to communicate with Voutsas several times about his and his company's repayment of the ransom money that Rovinsky caused to be paid for the Ring and the Necklace. Voutsas initially refused to respond to Rovinsky, and when he finally responded through counsel, he refused to compensate Rovinsky and his company for the substantial harm Voutsas and Peter Marco have caused.

  52. DR LLC was directly and proximately harmed by Peter Marco and Voutsas' misconduct, misrepresentations and fraud. Specifically, DR LLC has incurred damages in an amount greater than $1,130,000, which includes $565,000 that Rovinsky caused to be paid for the Ring in an effort to mitigate his company's losses, an additional $565,000 that Rovinsky caused to be paid for the Necklace to mitigate his company's losses, and the costs

DR LLC has had to expend on travel, hotels and security. DR LLC continues to suffer damages as a result of Peter Marco and Voutsas' misconduct and misrepresentations.

### FIRST CAUSE OF ACTION

### (Negligence – Against Peter Marco)

53. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

54. DR LLC and Peter Marco entered into valid consignment contracts, whereby DR LLC delivered to Peter Marco the Necklace and the Ring, and Peter Marco accepted those items, as evidenced by, among other things, the signed Memoranda attached hereto as Exhibits A and B.

55. As a consignee, Peter Marco owed a duty to DR LLC to use ordinary care with respect to the property consigned to him.

56. Peter Marco breached that duty by giving the consigned items to Rechnitz, a known felon.

57. Peter Marco further breached that duty by making several misrepresentations to Rovinsky during the course of the consignments, leading Rovinsky to believe his company would be paid for the jewelry, when in fact Peter Marco knew that Rovinsky would not be paid.

58. As a direct and proximate result of Peter Marco's gross negligence and breach of the duties it owed to DR LLC, the company has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

### SECOND CAUSE OF ACTION

### (Conversion - Against Peter Marco and Peter Voutsas)

59. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

60. DR LLC owned or had a right to possess the Necklace and the Ring.

61. DR LLC consigned the Necklace and the Ring to Peter Marco for the purpose of selling both items.

62. Rather than sell the two items, Peter Marco and Voutsas, acting on behalf of himself and his company, wrongfully disposed of the items by giving them to Rechnitz, a known felon. Peter Marco and Voutsas' conduct was not authorized by the terms of the consignments and was in derogation of DR LLC's possessory and ownership rights to the Necklace and the Ring.

63. Rovinsky demanded that both pieces be returned to him, and Peter Marco and Voutsas failed to do so, requiring Rovinsky's company to cause to be paid $1,130,000 to mitigate his company's losses and get the pieces back.

64. As a direct and proximate result of Peter Marco's and Voutsas' conversion of the two consigned items, DR LLC has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Fraud – Against Peter Marco and Peter Voutsas)

65. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

66. Voutsas, acting on behalf of himself and his company, Peter Marco, willfully deceived Rovinsky into making him believe that (a) Peter Marco had consummated the sale of the consigned items with a "private client"; (b) the "private client" had paid Peter Marco for the consigned items; and (c) Rovinsky would in turn be paid.

67. These representations were false when made, and Voutsas did not believe they were true.

68. To keep Rovinsky at bay and induce his reliance on Voutsas' misrepresentations and material omissions, Voutsas repeatedly told Rovinsky that everything was fine and that the delay in payment was simply an issue with his bank.

69. As described more fully above, Voutsas further engaged in deceitful conduct by suppressing the fact that he had given the consigned jewelry to Rechnitz, a known felon, who used the jewelry as collateral to obtain a $1 million loan. Voutsas knew what Rechnitz did with the jewelry and suppressed that information until January 23, more than a month

after Voutsas' misrepresentations began, in order to benefit himself to the detriment of Rovinsky.

70. Rovinsky reasonably relied on Voutsas' assurances.

71. Voutsas engaged in a further scheme to defraud Rovinsky by (a) connecting him with the individuals who unlawfully possessed the jewelry, with whom Voutsas was colluding, (b) encouraging Rovinsky to pay a ransom payment for jewelry that already rightfully belonged to his company, and (c) demanding Rovinsky pay more than one-hundred thousand dollars in addition to the amount being demanded by the individuals who purportedly had possession of the jewelry.

72. As a direct and proximate result of Peter Marco and Voutsas' deceitful and fraudulent conduct, DR LLC has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Negligent Misrepresentation – Against Peter Marco and Peter Voutsas)**

73. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

74. Voutsas, acting on behalf of himself and his company, Peter Marco, deceived Rovinsky into believing that (a) Peter Marco had consummated the sale of the consigned items with a "private client"; (b) the "private client" had paid Peter Marco for the consigned items; and (c) Rovinsky would in turn be paid.

75. These representations were false when made, and, at a minimum, Voutsas made them without reasonable grounds for believing them to be true.

76. To keep Rovinsky at bay and induce his reliance on Voutsas' misrepresentations and material omissions, Voutsas repeatedly told Rovinsky that everything was fine and that the delay in payment was simply an issue with his bank.

77. As described more fully above, Voutsas further engaged in deceitful conduct by suppressing the fact that he had given the consigned jewelry to Rechnitz, a known felon, who used the jewelry as collateral to obtain a $1 million loan. Voutsas knew what Rechnitz

did with the jewelry and suppressed that information until January 23, more than a month after Voutsas' misrepresentations began, in order to benefit himself to the detriment of Rovinsky.

78. Rovinsky reasonably relied on Voutsas' assurances.

79. As a direct and proximate result of Peter Marco and Voutsas' negligent misrepresentations, DR LLC has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Civil Theft (Penal Code § 496) – Against Peter Marco and Peter Voutsas)

80. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

81. Rovinsky entrusted Peter Marco with the Ring and the Necklace as a consignee.

82. Voutsas, acting on behalf of himself and his company, gave the jewelry to Rechnitz, a known felon, who in turn converted the jewelry for his own personal use. Voutsas then knowingly made several false representations to Rovinsky, as described above, with the specific intent to deceive Rovinsky, conceal Rechnitz's conversion, and benefit himself to the detriment of Rovinsky.

83. Voutsas engaged in a further scheme to defraud Rovinsky by (a) connecting him with the individuals who unlawfully possessed the jewelry, with whom Voutsas was colluding, (b) encouraging Rovinsky to pay a ransom payment for jewelry that already rightfully belonged to his company, and (c) demanding Rovinsky pay more than one-hundred thousand dollars in addition to the amount being demanded by the individuals who purportedly had possession of the jewelry.

84. Voutsas' conduct constitutes theft, as that term is defined in California *Penal Code* § 484(a).

85. As a direct and proximate result of Peter Marco and Voutsas' misconduct, DR LLC has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Aiding and Abetting Conversion and Civil Theft –

### Against Peter Marco and Peter Voutsas)

86. Rovinsky incorporates by reference the foregoing paragraphs of the Complaint.

87. After Voutsas, acting on behalf of himself and his company, gave Rechnitz the jewelry that Rovinsky had consigned to Peter Marco, Rechnitz converted the jewelry for his own personal use and gave the pieces to a lender as collateral to obtain a $1 million loan.

88. At all times relevant to this Complaint, Voutsas knew about Rechnitz's misconduct as described above.

89. Voutsas' repeated false representations to Rovinsky, as well as Voutsas' suppression of critical information about what had happened to the consigned jewelry, substantially assisted Rechnitz's theft.

90. Voutsas further assisted Rechnitz by instructing Rovinsky not to report anything to law enforcement and to be patient if Rovinsky wanted to recover the jewelry, which Rovinsky reasonably understood to be threats to Rovinsky's personal safety and ability to obtain the jewelry. Voutsas' threats allowed Rechnitz to complete his criminal acts.

91. Voutsas' acts were a substantial factor in causing Rovinsky harm.

92. As noted, Voutsas' own conduct breached the duties he and his company, Peter Marco, owed to Rovinsky.

93. As a direct and proximate result of Peter Marco and Voutsas' aiding and abetting of Rechnitz's misconduct, DR LLC has suffered damages in an amount greater than $1,130,000, with the exact amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, DR LLC respectfully respects that this Court enter an award:

a. Awarding DR LLC compensatory damages in an amount greater than $1,130,000;

b. Awarding DR LLC treble damages pursuant to California *Penal Code* § 496(c);

c. Awarding DR LLC reasonable attorneys' fees pursuant to California *Penal Code* § 496(c);

d. Awarding DR LLC punitive damages pursuant to California *Civil Code* § 3294(a) in an amount to be proven at trial;

e. Awarding DR LLC all costs of this lawsuit; and

f. Awarding such other and further relief as the Court deems just and appropriate.

Dated:  March 18, 2020                    BIENERT | KATZMAN PC

By: /s/ Anthony R. Bisconti
    Steven Jay Katzman
    Anthony R. Bisconti

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
Jason A. Levine (*pro hac vice forthcoming*)
Andrew A. Erdlen (*pro hac vice forthcoming*)

Attorneys for Plaintiff David Rovinsky LLC

**DEMAND FOR JURY**

DR LLC demands trial of this matter and all claims alleged herein by a jury.

Dated: March 18, 2020

BIENERT | KATZMAN PC

By: /s/ Anthony R. Bisconti
   Steven Jay Katzman
   Anthony R. Bisconti

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
Jason A. Levine (*pro hac vice forthcoming*)
Andrew A. Erdlen (*pro hac vice forthcoming*)

Attorneys for Plaintiff David Rovinsky LLC

# CERTIFICATE OF SERVICE

I declare that I am a citizen of the United States and I am a resident and employed in Orange County, California; that my business address is 601 W. 5th Street, Ste. 720, Los Angeles, California 90071; that I am over the age of 18 and not a party to the above-entitled action.

I am employed by a member of the United States District Court for the Central District of California, and at whose direction I caused service of the foregoing document entitled on all interested parties as follows:

[X]  **BY ELECTRONIC TRANSMISSION:** by electronically filing the foregoing with the Clerk of the District Court using its CM/ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies all parties in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on **March 18, 2020** at Los Angeles, California.

_____
Elizabeth Garcia